Good morning, Your Honors. May it please the Court, my name is Clothilde DeWeese, and I represent the appellant, April-Lee Williams, in this case. There are two primary issues on appeal. The first involves the correct interpretation of Washington's ADAD statute, which was enacted in 1986 to protect Washington residents from the growing problem caused by ADAD machines and their use by telemarketers. The second issue is whether the Telephone Consumer Protection Act, known as the TCPA, preempts this Washington statute. Contrary to the lower court's ruling, the savings clause contained in the TCPA expressly does not preempt state laws such as Washington's ADAD statute, which prohibits the use of ADADs for either intrastate or interstate calls when made for the purpose of commercial solicitation. But why can't we interpret the two statutes to avoid the preemption issue by restricting the reach of the Washington statute to intrastate calls and then hold that Congress filled in the gap for interstate calls with the TCPA? Well, first of all, I think that restricting the state statute would be, it's an inappropriate restriction of that statute. And secondly, I believe that in this situation, when the savings clause is unambiguous, when properly interpreted, it specifically authorizes states to enact laws prohibiting interstate ADAD calls. Why isn't my question consistent with the legislative history behind the TCPA, which, as I understand it, Congress believed, or there's a suggestion in the papers, that the states were perfectly capable of regulating intrastate calls, but that the feds needed to step in in order to handle the gap for interstate? Well, there are two responses to that. First, there is a governing rule of construction set forth in the Gade decision by the Supreme Court that when interpreting a statute, every clause and every word of that statute should be given meaning. And when a statute such as this is unambiguous, the correct interpretation must begin and end with a statutory text. The district court found the statute was ambiguous, did it not? Correct. The district court did find that it was ambiguous, and it is our position that that was in error, that the statute, when properly interpreted, is unambiguous and expressly authorizes state statutes prohibiting ADAD use. Go ahead, I'm sorry. I was just going to say, the question that I'm wrestling with, though, is what intrastate modifies? Well. In the savings clause. Intrastate in the savings clause modifies only the first phrase in the clause. In other words, the phrase that says, nothing shall preempt any state law that imposes more restrictive intrastate requirements or regulations on. And then there is a comma and a disjunctive or, and then says, or which prohibits. And based on fundamental canons. But if we interpret it the way that you're asking us to do, then there would be absolutely no need at all for Congress to act, because under your reading of the savings clause, the states can do everything. Well, I think it's clear from the legislative history of the TCPA that what Congress intended to do was to create interstitial law, not to supplant state law, but to create. But your reading of the statute, as you were just urging me to read it, doesn't suggest that there is any gap that Congress needed to fill. Well, I believe that the TCPA. What do you think the federal statute was designed to do, except your reading of the statute? I believe the federal statute is true that the TCPA, if you read the legislative history, that the Congress intended to come in and there were situations of telemarketers evading state regulation, just by going across state lines. So they came in and said they were, if you read the legislative history, they intended to create the minimum standards. But under your reading of the statute, Washington could, if it wished, prohibit all telemarketing, and then presumably, and I guess your theory would have to be under some kind of long-arm reach, it could take enforcement action against a New Jersey telemarketer who had the audacity to make telemarketing calls within the state of Washington. That is true, and I believe that the legislature What do we need Congress to do? Well, the legislative history reflects that Congress intended to set a baseline if other states didn't enact laws prohibiting. We have to assume that But then you wouldn't need a savings clause if there was no state legislation on the subject, would you? Your argument, I think, proves too much, at least to this judge. Well, I think it's important to bear in mind that if you look at the interstitial nature of the law, what Congress intended to do was set a baseline. Well, you keep using the word interstitial, but I'm looking for a gap under your reading of the savings clause, and I'm having a hard time figuring out what it is that Congress was addressing if the states can do everything intra- and interstate. Well, I think Congress, when Congress was confronted with this problem in 1991, there had been a surge of consumer complaints, and there was a problem with states, with telemarketers evading state laws. I think that the legislative history reflects that 40 states had passed laws attempting to regulate these calls, and Congress, and for that reason, Congress came in and said, we're going to set a ground, you know, a ground level of protection here. But what Congress also did, so that was to say, and it makes sense that Congress would say that states could enact more restrictive. They also clarified that states could enact more restrictive interstate regulations. So that was one purpose of the federal statute. I think I understand your argument, but if I conclude, contrary to your argument, that there is an ambiguity, why shouldn't we give Chevron deference to the FCC's interpretation, which essentially warned that we could run into preemption problems if the FCC, as it apparently has done with interstate telemarketers, permitted them to make these calls, even in states like Washington, by enacting certain requirements that the telemarketers have to meet so that they don't have to meet 50 different sets of state requirements? Well, first, it is our position that the federal statute is unambiguous, and Chevron clearly provides. That's not my question, counsel. I'm beyond your position. Now I'm asking you to assume, for purposes of my question, that there is an ambiguity. All right. Now I'd like you to address the Chevron deference issue. And when you're done addressing that, I have a question for you, too. All right. The FCC stated in its 2003 order that it wasn't clear if it applied to interstate and intrastate. What the FCC primarily said, and which was quoted repeatedly in MCI's briefing, is that any differing state regulations would most certainly be preempted. And so that's what I think the answer is. There is a distinction to be drawn. We have to assume that Congress ---- But that assumes, does there not, and I don't want to step on Judge Gould's time, but that assumes, does there not, that the state has prohibited all telemarketing calls into the state of Washington and that the FCC has permitted telemarketing calls subject to certain restrictions. Now we've got a clear conflict, do we not? Well, there is nothing in the TCPA which requires any telemarketer to use an ADAT machine for purposes of a telemarketing call. Well, except that, as I read the record, the feds seem to permit ADAT machines for certain purposes, don't they? They do permit ADATs for certain purposes. But, again, we are left with it. We are dealing with an express savings clause. Or a conflict, one or the other. I believe that any purported conflict is illusory because, again, the federal statute does not require any telemarketer to use an ADAT for purposes of their calls. And that's why the abandoned call message that MCI cites is an illusory conflict because there is no conflict here. The word interstate, again, applies only to the first clause and does not apply to the second clause. Do you think I could get you onto another issue? All right. Okay. So I'm very concerned that in this argument we've used ten minutes of it up and it seems to me they could be missing something, but that we are getting the preemption cart ahead of the liability horse because if the state statute is not violated by the use of an automatic dialing device that does not leave a message, you know, if 80.36400 subpart 2 prohibiting commercial solicitation with an ADAT, if that's not violated by the use of a machine capable of leaving a device or leaving a message that just calls and doesn't leave a message, then as I understand it, your claim is out and you never get the preemption. So we don't have to. And I thought Judge Zille ruled on that basis. So I'd like you to address that issue because I'm sort of hung up on that right now. All right. Washington's ADAT statute has four sections. The first section is a definition section, and subsection 1A defines an ADAT. It defines an ADAT as a device which automatically dials telephone numbers and plays a recorded message once a connection is made. And I think the significant point here is that when you are defining something, it doesn't cease being what it is because all of the functional capacity. So what's the prohibition under Part 2? The prohibition under Part 2 states that it is that no person may use an ADAT for purposes of commercial solicitation. Okay, so that's getting you towards the issue of concern with me. When subpart 2 says you can't use an ADAT to solicit in the state, Judge Zille thought that meant you can't use an ADAT that dials and leaves a message. But the fact that a machine's capable of something isn't enough to constitute the violation if it's not used for that. Whereas your position is it is, right? I think you better address that issue because, you know, that's a critical issue for you. Okay. Our position is that the lower court erred by engrafting the definition portion in subsection 1 into the prohibition section of subsection 2, which broadly states that an ADAT cannot be used for purposes of commercial solicitation. I think as an analogy, an answering machine is a device that answers a person's telephone and records caller's messages. It remains an answering machine regardless of whether it's full and cannot take any more messages or regardless of whether someone calls and decides not to leave a message. And it's not transformed into an answering machine because a message is played back or a message is left. In the same way, an ADAT is an ADAT regardless of whether all of its functional capacities are being used. It's an ADAT, therefore, regardless of whether in any given situation a prerecorded message is left. In this case, MCI has conceded that at times the ADATs it used left prerecorded messages. So MCI has conceded that these were ADATs, and there is no question that they were being used for purposes of commercial solicitation. So that is our position as to why, therefore, a violation can occur and does occur whenever an ADAT is used for purposes of commercial solicitation. Okay. Well, you've got less than a minute now. If you want to make a reply argument to Mr. Lunsgard, you should try to wrap up what you're saying. Okay. We'll give you an extra minute, but we really have to kind of keep to our schedule. Thank you, Your Honor. The other thing I want to really stress is that when interpreting this state statute, it is vitally important to recognize that this is a remedial statute, and for that reason Washington law mandates that it be liberally construed. MCI's construction is overly restrictive, and it frustrates the purpose for which this statute was enacted, which was to protect Washington citizens from the bombardment caused by these ADAT calls. Thank you. Okay. Thank you, counsel. And we'll give you a minute of rebuttal time. So your time was up. Okay. Mr. Lunsgard. Thank you, Your Honor. David Lunsgard, Graham and Dunn, on behalf of the MCI defendants. With me at counsel table is Rick St. John from Munger Tolls and Olson, who was on the briefing. As the prior discussion, I think, illustrated, there are two basic issues. We have the statutory interpretation question regarding the Washington statute, and then we also have federal preemption. But do you agree with Judge Gould that we don't even get to the thorny issue of preemption if we agree with Judge Zille on the manner in which he interpreted Washington law? Absolutely. They are separate and independent grounds for Judge Zille's decision to dismiss the complaint here. And the logically first question is, does the Washington statute actually even render liability under these circumstances or not? And if the answer to that question is no, as we urge, it's unnecessary to reach the preemption issues at all. There are four reasons I'd identify as to why Judge Zille correctly interpreted the statute and why this Court ought to interpret Washington's ADAD statute in the same way that all ADAD statutes, at least reflected in the case law, have been applied and interpreted. The first, of course, is the statutory language. The statutory language is, in the present tense, an unconditional. It says that an ADAD is a device which automatically dials telephone numbers and plays a recorded message. Not that it sometimes plays a recorded message. Not that it has the capacity to play a recorded message. That it does. Under the plaintiff's theory, of course, the device may never play a recorded message as long as it has the capacity to, and that would still trigger liability. The conclusion is firmed up when you read the rest of the definition, which concludes, once a connection is made, it establishes a clear causal link as to what the device is supposed to do. The device dials a number. When a connection is made, it plays a recorded message. Period. There's no opportunities for alternative results. It's clear that an ADAD is an ADAD for purposes of this statute. When it dials a number, a connection is made, and a recorded message is played. But the plaintiffs say, well, how can the device be an ADAD and then not an ADAD? Well, this is no anomaly. There's no reason under the law that a statute can't be passed that would define a particular physical object, or in this case a physical object in some software, as having legal significance in one context when being used in one way and not having legal significance when being used in a different way. You could have the same physical object, whether it's a car or a pen or anything else, that could become illegal contraband when used in a particular way and not illegal contraband when used in a different way. So the anomaly that they try to present is no anomaly at all. A second reason to support the conclusion that our interpretation of the statute is correct is the legislative findings. The Washington legislature enacted certain findings in support of the statute, and one of them was the finding that the use of ADADs deprives consumers of the opportunity to immediately question a seller. Of course, that's only true when a recorded message is being played. And again, the Washington legislature... Is that a written finding in the statute itself? It is a written finding. As opposed to like a legislator's floor statement? No, it is not a floor statement. This is an explicit legislative finding, Your Honor. If you go to the statute, in the notes to the statute, there are three legislative findings that are attached to the statute. And the only way that one can conclude that, make that finding, is if you are talking only about recorded messages. Under plaintiff's theory of the statute, of course, that finding could be absolutely untrue because the device could be an ADAD and violate the statute even if no recorded message is ever played. A third reason is that the plaintiff's broad reading of the statute leads to inevitably absurd results. If we define an ADAD as any device that has the capacity to dial a number and play a recorded message, the types of devices that could be encompassed by this would be enormous. Even modern computers, perhaps even cell phones today, could be programmed to dial numbers and leave recorded messages. And then any time anybody made a call, and even a live call, it doesn't have to be a recorded call, of course, using such a device, it becomes a violation of this statute. So I have a question. It's probably kind of a dumb question, and don't answer if the record doesn't tell us. But if the record shows, does it explain why the machines were used to dial people's numbers but that they did not leave a recorded message? Does the record tell us that? What I read suggested that the record shows that, at least for this plaintiff, the devices did not leave messages or didn't always leave messages. That's true. But is there anything in the record that explains what MCI's practice was? Like why they would have a device that dials, like my number, for example, and then goes blank? Well, Your Honor, let me expand on that. I believe this is reflected in our summary judgment briefing, which is in the record. No, excuse me. No, it's not. But I would suggest going to the FCC order, which discusses predictive dialers, and the FCC made some specific factual findings about predictive dialers. The purpose of a predictive dialer is to establish a connection between a consumer and a live salesperson. The machine does the dialing, but the objective is to have a live call with the salesperson. The potential problem arises when a connection is made with the consumer, but there isn't a live salesperson available to take the call, so the consumer is faced with some dead air. And this is what led the FCC to pass the regulation requiring the playing of the abandoned call message. But that is the reason why the calls could be made by a computer. Your summary judgment motions would be? They're in the record, right? No. They might not be in the excerpt, but they're in the district court record, right? Well, they would be, Your Honor, except for the fact that I misspoke. When I was referring to our summary judgment papers, I was referring to a summary judgment in a related case, but not in this particular case. Okay. Well, then I probably just won't pay any attention to it. Thank you, Your Honor. And finally, with respect to the interpretation of the statute, we direct the Court's attention to the case law. We've cited extensive cases discussing ADAD statutes in other states, recognizing that what ADADs are about, what makes them legally interesting and unique, is the delivery of recorded messages, not the capacity to deliver recorded messages. And in particular, we directed the Court's attention in our briefing to Judge Robart's decision in Spafford, in which he recognized that this statute, the Washington statute, under this, ADADs are devices which greet recipients or their answering machines with a prerecorded message. And the one thing I want to emphasize with respect to that is this was not preliminary throat clearing on behalf by Judge Robart. He was actually engaged in a constitutional analysis of the Washington statute, determining whether or not it violated free speech principles. In order to conduct that analysis, the first thing he had to do was to evaluate what it was that the statute did, because if the statute restricted one thing, it would be one form of constitutional analysis. If it restricted something else, it would be another. So when he decided what the statute actually did, it was an essential part of his constitutional analysis. Just as it was in this Court's decision in Bland, where this Court, as Judge Robart was in the Spafford case, engaged in a constitutional analysis of the California ADAD statutes, which the Court concluded, as Judge Robart did with respect to the Washington ADAD statute, that under the California statute, ADADs are machines that dial telephone numbers and deliver prerecorded messages. We've cited other cases to the same effect. And the plaintiffs have no real response to any of these cases. We'd urge the Court, I mean, in effect, what they're doing is they're asking the Court to interpret Washington's ADAD statute differently than any other ADAD statute that's reflected in the case law, and differently than two separate federal judges in the Western District of Washington have already done. If and only if the Court rejects our statutory interpretation argument and accepts the notion that Washington's ADAD statute applies to the use of devices that merely have the capacity to deliver recorded messages, we get the federal preemption. And the key here is, it's true, we have conceded that the devices have the capacity to play recorded messages. Specifically, they have the capacity to play the federally mandated abandoned call message, because we don't want to violate federal law in using the devices. We know that abandoned calls are a possibility when the devices are used, and therefore they are configured to be able to play the abandoned call message, and have from time to time done so. With respect to evaluating preemption, we had some, there are often very interesting arguments about the interpretation of the Savings Clause, but there's also a couple of arguments that kind of cut through that and get to preemption without necessarily getting into some of the thornier issues regarding the Savings Clause. Well, Mr. Lensgard, based on what you just said, if I assume that some of these calls did leave these abandoned call messages, then at least as to that subclass of calls, aren't we now in violation of the Washington statute, which clearly then requires that we address the preemption problem? Because now we've got a conflict between an FCC requirement and Washington law, which the FCC warned about in 2003. Am I wrong? Well, first of all, that's not an argument that the plaintiffs have made, nor is it the class that they have defined. Those are not the claims that have actually been made. Well, I assume that's a fairly small class compared to the 12 million or so that they'd like to tag your client for at $500 a call. Well, yes, Your Honor, the FCC regulations require that abandoned calls be no more than I think 3% of the calls total, so it is a relatively small number. And so it is unnecessary to reach the preemption argument, because if you accept our interpretation of the statute, that it requires the delivery of a recorded message and the plaintiffs have not made that particular claim, it's unnecessary. So you're saying that that message that's required by the FCC is not a commercial message, that it's simply an informational message to avoid dead air time? Well, it is actually an informational message. It is not a message designed to encourage people to purchase goods or services. What does the message say, do you know? Well, the regulation actually sets forth the specific requirements with respect to the message. It states only the name and telephone number of the business entity or individual on whose behalf the call was placed and that the call was placed for telemarketing purposes. But to turn back to that initial preemption argument that I was suggesting to the Court, and that is the express preemptive force of the first clause of the Savings Clause. Before you get to the issues of regulations or prohibitions, the first portion of the Savings Clause discusses the standards prescribed under subsection D of this section. Now, that exception itself has expressed preemptive force. The only court that has decided that, we've cited to the case of the Charvat decision. If you turn to subsection D, the statute directs the FCC to promulgate technical and procedural standards for systems that are used to transmit prerecorded voice messages, et cetera. The FCC has promulgated extensive regulations under the Telephone Consumer Protection Act, which are contained in the FCC regulations as reflected in the FCC order, including the regulation that is at issue here, the abandoned call message. And so we would urge the Court that compliance with the FCC standard that requires us to play the abandoned call message is expressly preempted by the first clause of the Savings Clause on which the plaintiffs rely. And if you agree with us, it is unnecessary to reach the other issues. I said that again. I think I missed your point. Okay. Well, the first portion of the Savings Clause, standards prescribed under subsection D, has expressed preemptive force. The rest of the clause saves for the states the authority to do various things, except for those standards. Subsection D, in turn, directs the FCC to promulgate standards. The FCC has promulgated standards, which we have cited, including the abandoned call message. Therefore, the abandoned call message has expressed preemptive force simply based on the introduction to the Savings Clause. Now, a second reason to find preemption, and as the Court may tell from our briefing we think that there are many, is this distinction between regulation and prohibition. Now, clearly the plaintiffs have staked their case on this particular distinction. They have conceded that if the Washington statute is a regulation, it would be preempted, but they say, oh, this is a prohibition, which is protected. The first question that comes up is, and this was discussed, I think, in the opening arguments, as to whether or not this is a sustainable distinction. We've cited, we've given a number of reasons in our brief as to why it is not a sustainable distinction, in particular the Supreme Court's recognition in Darby that one cannot carefully distinguish or successfully distinguish between regulations and prohibitions. Finally, Your Honors, with respect to preemption, there are many other issues that I could go into in more detail, but they are covered in the briefing. But I'd like to conclude with both the legislative history and the FCC's conclusion that in a circumstance like this, that state regulation of interstate telemarketing is preempted, and it is precisely to preserve a uniformity of national regulation so that the FCC, the expert technical body entrusted with the implementation and the application of these statutes, can establish the rules for national telemarketing, both protecting consumers and protecting interstate commerce without interference by the states. Thank you very much. Okay, thank you. Okay, Ms. Deweese, we're giving you some rebuttal time. Thank you. I appreciate it, Your Honor. I would first like to point the Court to Plaintiff's Excerpt of Record, page 86, lines 22 through 25, in which the prerecorded message left by MCI on at least 10,000 phone calls stated, quote, Hello, this is MCI calling at and then listing the telephone number. We tried to reach you today for telemarketing purposes. We're sorry we missed you. Have a nice day. And a second message that they used, which is essentially the same. So there is no question that these ADAD calls in many occasions did leave prerecorded messages and that they were for purposes of commercial solicitation. But do you concede that that was in conformance with the FCC regulation pursuant to subsection D of the Savings Clause? Well, it is a CFR. It was a requirement that that message be left. So the answer is yes, that that was the message that was required by the FCC. Yes. But there is no conflict by that because, again, if the state statute is not violated because the call isn't made in the first place, there is no need to ever leave that recorded message. And, again, the federal statute does not require anyone to use an ADAD. So can I ask a question then? Yes. With regards to your earlier argument that whether or not a device leaves a message is essentially irrelevant. Yes. If the federal regulations require that a message be left and you use an automatic device that dials the call, aren't you then saying that in every instance where an automatic dialing machine is used, you're going to have an ADAD because it dials the number and it leaves a message? Well, my response to that, Your Honor, is it's an ADAD regardless of whether it leaves a message. I understand that. So then what's the point of the federal regulation that says that when you use these recorded calls that you must leave this message that says, you know, we called, period? The point of the federal regulation was to address the problem caused by predictive dialers in which phone calls would be automatically dialed before a live agent is available to take the call. And because there were these abandoned calls, the FCC decided it would be better to have a prerecorded message because it's disturbing to people to answer the phone and then just have a click or a hang-up because there was no live sales agent available. That's the purpose of that, was to address the predictive call issue. But again, in this case, you don't get to that. The conflict is illusory if the state statute is complied with and no ADAD call is made for purposes of commercial solicitation. Your answer to the question is don't make the call, right, into Washington. Yes. Simple as that. That's right. And it's our position that, as pointed out in the Stenehjem v. Freed's case, the North Dakota Supreme Court case, it's very easy for telemarketers to figure out, to determine which states have prohibited these calls and simply program their machines, their devices, so that they don't make calls to those states. Okay. Well, we're well over your time, even with the extra minute we gave you. All right. So I would say finish your argument, please, and I'd like to move on. I would just briefly like to state that there are three legislative findings after the state statute. We'll give you 30 seconds for your brief statement. All right. Two of those three are directly implicated. The protection of privacy and not tying up the phone lines are directly implicated, regardless of whether a message is ever left. And, again, given the liberal construction of the state statute, the fact that the first legislative finding envisions or anticipates a prerecorded call in no way detracts from what a liberal construction would require, which is that a violation occurs regardless of whether a prerecorded message is left by an ADAT. Okay. Thank you. Thank you, Your Honors. Now, Mr. Lunsgard, we went, you know, three minutes past the extra minute. So we don't want to be unfair to you. If you need a minute, I'd give you an extra minute. But if you don't, I think we're done. Okay. If I may, just 10 seconds, Your Honor, and that is with respect to the state statute. I can't set the clock for 10 seconds. But we're watching it. Okay. So go ahead. Ten or 15 at the most. With respect to the issue of whether or not we can comply with the state and federal laws simply by not making calls whatsoever, I would direct the courts to the Supreme Court's instructive example of the windshield retention requirement in Geier, which is discussed in the case law. I mean, in our briefing. Thanks. That's 16 seconds. That's pretty good. Mr. Weiss, I think we're done. Unless you need five seconds.
judges: Benitez, Gould, Tallman